```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                        LOUISVILLE DIVISION

 3
      UNITED STATES OF AMERICA,      )  Case No. 3:17MJ-201
 4                                   )
              Plaintiff,             )
 5                                   )
      VS.                            )
 6                                   )
      CHICOBY SUMMERS,               )
 7                                   )  April 17, 2017
              Defendant.             )  Louisville, Kentucky
 8

 9             ******************************************

10        TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING
                   BEFORE HONORABLE DAVE WHALIN
11                UNITED STATES MAGISTRATE JUDGE

12             ******************************************

13
      APPEARANCES:
14
      For United States:      Erin McKenzie
15                            U.S. Attorney's Office
                              717 West Broadway
16                            Louisville, Kentucky 40202

17    For Defendant:          Rob Eggert
                              600 West Main
18                            Suite 300
                              Louisville, Kentucky 40202
19
      [Defendant present.]
20

21

22                    Alan W. Wernecke, RMR, CRR
                         Official Court Reporter
23                       232 U.S. Courthouse
                      Louisville, Kentucky 40202
24                         502-625-3779
      Proceedings recorded by mechanical stenography, transcript
25    produced by computer.
```

1      (Begin proceedings in open court at 3:59 p.m.)

2           DEPUTY CLERK:  3:17MJ-201, *United States of America v.*

3  *Chicoby Summers*.  We are here for a preliminary and detention

4  hearing.

5           THE COURT:  Appearances, please.

6           MS. MCKENZIE:  Good afternoon, Your Honor.  Erin

7  McKenzie on behalf of the United States.

8           MR. EGGERT:  Good afternoon, Judge.  Rob Eggert on

9  behalf of Chicoby Summers.  He's present.

10          THE COURT:  Good afternoon.  Mr. Eggert, do you wish

11 to have the preliminary hearing, sir?

12          MR. EGGERT:  I do, Your Honor.

13          THE COURT:  All right.  Ms. McKenzie.

14          MR. EGGERT:  We would move for a separation of

15 witnesses.

16          MS. MCKENZIE:  I only have one witness.

17          THE COURT:  Okay.

18          MS. MCKENZIE:  United States calls Special Agent

19 Joseph Hicks.

20      (JOSEPH HICKS, called by United States, sworn.)

21          THE COURT:  All right, ma'am.

22                     DIRECT EXAMINATION

23 BY MS. MCKENZIE:

24 Q.  Can you please state your name and tell the Court where you

25 work?

1    A.   Joseph Hicks.  I work for the Bureau of Alcohol, Tobacco,

2    Firearms & Explosives.

3    Q.   And what's your position with the ATF?

4    A.   I'm a special agent.

5    Q.   Do you have a particular assignment?

6    A.   I do.  I've been assigned to the LM Intel Joint Task Force.

7    Q.   What does that mean?

8    A.   It's a task force comprised of different federal, state, and

9    local agencies that targets violent crime.

10   Q.   Okay.  Is that here in Louisville?

11   A.   Yes, ma'am.

12   Q.   Okay.  Special Agent Hicks, did you swear out a complaint

13   against Mr. Summers on the 13th of April?

14   A.   I did.

15   Q.   Okay.  And have you reviewed the affidavit in support of

16   that complaint prior to your testimony today?

17   A.   I have.

18   Q.   Okay.  Everything in that affidavit, is it -- does it

19   continue to be true and accurate?

20   A.   It does.

21        MS. MCKENZIE:  Your Honor, I would offer the affidavit

22   in support of the complaint in support of the Government's

23   submission of probable cause.

24        THE COURT:  All right.

25        MR. EGGERT:  I don't object.

1           THE COURT:  Okay.

2           MS. MCKENZIE:  I have just a couple of other items to

3    submit.

4           THE COURT:  All right.

5           MS. MCKENZIE:  Your Honor, may I have permission to

6    approach the witness?

7           THE COURT:  Yes.

8    Q.  Special Agent Hicks, I'm going to ask you to just look at

9    this document and tell me, are you familiar with that?  Do you

10   recognize that?

11   A.  I do.

12   Q.  Okay.

13          THE COURT:  Would it be easier to use the Elmo so we

14   can all see the document?

15      (Document camera malfunction.)

16   Q.  This I have marked as Item 1.  What is this?

17   A.  This is a map that's been printed off from Google Maps.  It

18   just has two markers on here, one at 1711 Wilson Avenue and one

19   at 1728 Youngland.

20   Q.  Okay.  And are those the addresses referenced in your

21   affidavit?

22   A.  They are.

23          MS. MCKENZIE:  Your Honor, I would move to admit this

24   into evidence as Government Exhibit 1.

25          MR. EGGERT:  I'm not objecting, Judge.

1          (Government Exhibit 1 admitted in evidence.)

2    Q.   Do you recognize these?

3    A.   I do.

4    Q.   Let's take what's premarked as Government Exhibit 2.   What

5    is that?

6    A.   That is a firearm that was witnessed thrown from the vehicle

7    that Mr. Summers was driving.

8    Q.   Okay.   What's premarked as Government Exhibit 3, what is

9    that?   Do you recognize that?

10   A.   I do.   That's a firearm that was found at Mr. Summers'

11   apartment subsequent to the search warrant.

12   Q.   And the gun is inside a holster?

13   A.   It is.   The holster was recovered from inside the front

14   waistband of Mr. Summers.

15   Q.   Okay.   Did you put the gun into the holster?

16   A.   I did.   I checked the fit, and it does fit.

17          MS. MCKENZIE:   Your Honor, I would move to admit 2

18   and 3.

19          THE COURT:   Any objection, Mr. Eggert?

20          MR. EGGERT:   No.

21          THE COURT:   All right.

22          (Government Exhibits 2 and 3 admitted in evidence.)

23   Q.   Special Agent Hicks, in your affidavit you refer to the fact

24   that Mr. Summers is a convicted felon?

25   A.   I do.

Hicks - Direct                                                          6

1    Q.  Have you reviewed any of the documentation associated with

2    his previous felony conviction?

3    A.  I have.

4    Q.  Okay.  Did you review an arrest report?

5    A.  I did.

6    Q.  And was Mr. Summers arrested in July of 2013 in possession

7    of a gun?

8    A.  He was.  It was a Ruger 9mm with a high-capacity magazine.

9    Q.  Are you aware, did he have any other pending court cases at

10   that time?

11          MR. EGGERT:  Judge, first of all, I thought they were

12   going to tie that into anything.  He was arrested.  If they have

13   got more information on that, then they should put it on.  But

14   just the mere fact he was arrested with a gun in 2013 is

15   meaningless.  I would object to it.

16          THE COURT:  I'm not sure it's meaningless.  He's

17   charged with being a felon in possession.

18          MR. EGGERT:  He's charged with being a felon in

19   possession, but back in 2013, they have got to connect up that

20   somehow.  This is the probable cause as to whatever happened in

21   April.  I don't know what they are talking about in 2013 absent

22   some, you know, nexus to this.

23          THE COURT:  Well, let's see.  Go ahead.

24          MR. EGGERT:  Judge, I think they allege that in 2014

25   he was convicted of a crime.  So it wouldn't have been a felon

Hicks - Direct                                                    7

1    in possession in 2013.

2              THE COURT:  Mr. Eggert, let's see where this goes.

3              MR. EGGERT:  Thank you.

4              THE COURT:  Go ahead.

5    BY MS. MCKENZIE:

6    Q.  Are you aware of any pending court cases that Mr. Summers

7    had at the time of his arrest with that gun in 2013?

8    A.  I am.  He had a pending concealed carrying a deadly weapon

9    at the time of the arrest in 2013.

10   Q.  Okay.  In Jefferson District Court?

11   A.  Yes, ma'am.

12   Q.  Okay.

13             THE COURT:  Ms. McKenzie, what is the relevance of

14   that?

15             MS. MCKENZIE:  Well, Your Honor, it's relevant to the

16   Court's determination on detention.

17             THE COURT:  I thought we were doing the preliminary

18   hearing.

19             MR. EGGERT:  That's right, Judge.  I would object

20   again.

21             THE COURT:  All right.  We will separate those out.

22   Let's talk about the present charge, okay?

23             MS. MCKENZIE:  Okay.

24             THE COURT:  Thank you.

25             MS. MCKENZIE:  I don't have any further evidence.

1              THE COURT:  All right.  Mr. Eggert.

2              MR. EGGERT:  Thank you.

3                       CROSS-EXAMINATION

4    BY MR. EGGERT:

5    Q.  Agent, this complaint states that there was an investigation

6    at 1711 Wilson Avenue on April 12th, 2017; is that correct?

7    A.   It states that we were conducting an investigation which led

8    us to that address where we were conducting surveillance, yes,

9    sir.

10   Q.  All right.  And was Mr. Summers the subject of that

11   investigation?

12   A.   He was part of it, yes, sir.

13   Q.  And who else was part of it?

14             MS. MCKENZIE:  Objection.  Relevance.

15   Q.  I'll ask it this way:  Were people living -- you say you

16   were surveilling 1711 Wilson Avenue.  The people who lived

17   there, were they part of that investigation?

18   A.   They were.

19   Q.  All right.  Now, at some point Mr. Summers leaves 1711

20   Wilson, according to you, correct?

21   A.  Yes, sir.

22   Q.  And he gets into the driver's seat of a vehicle; is that

23   right?

24   A.  Yes, sir.

25   Q.  All right.  And then he allegedly drives away and doesn't

1    stop at a stop sign; is that correct?

2    A.  Yes, sir.

3    Q.  And so a narcotics officer tried to pull him over; is that

4    what you say happened?

5    A.  Yes, sir.

6    Q.  Did you see that?  Were you there?

7    A.  I was not next to the narcotics officer.

8    Q.  So you didn't see that?

9    A.  No, sir.

10   Q.  All right.  And I assume that this stop for a stop sign was

11   a pretextual stop; is that true?

12          MS. MCKENZIE:  Objection.

13          MR. EGGERT:  I'm trying to find out what's happening

14   here.  They talked about it in the complaint.

15          THE COURT:  What's your objection, Ms. McKenzie?

16          MS. MCKENZIE:  I object to his characterization that

17   it was a stop based on a traffic violation.

18          MR. EGGERT:  He can answer that if he knows.

19          THE COURT:  Wait a minute.  Everybody take a breath

20   here, okay?  We are going to do this, and we are going to be

21   organized, and it's going to be respectful.

22       You can ask him why the vehicle was stopped, Mr. Eggert.

23   Q.  Why was the vehicle stopped?

24   A.  Sir, the vehicle was stopped because it failed to stop at a

25   stop sign.

1    Q.  Were there other reasons why this vehicle was stopped?

2    A.  No, sir.

3    Q.  Okay.  It was just the narcotics officers were doing traffic

4    detail that day; is that correct?

5    A.  No, sir.  They were actually task force officers.

6    Q.  All right.  The task force was doing traffic detail that

7    day?

8    A.  No, sir.

9         THE COURT:  Mr. Eggert, he's answered your question.

10   Q.  Now, you stated that there were three individuals in the

11   vehicle; is that correct?

12   A.  Yes, sir.

13   Q.  Okay.  And according to this complaint, Roman Brown and

14   Byram Ward were in this car, correct?

15   A.  Yes, sir.

16   Q.  All right.  Now, did you see a firearm thrown from the

17   car?

18   A.  I did not.

19   Q.  Did other officers see a firearm thrown from the car?

20   A.  They did not.

21   Q.  Okay.  According to this complaint, a firearm was thrown

22   from the passenger side of the car; is that correct?

23   A.  Yes, sir.

24   Q.  All right.  From the rear passenger or the front passenger?

25   A.  That's unknown.

1    Q.  But a witness stated, as I understand it, that a gun was

2    thrown from the passenger side, hit the road, and ended up in

3    the front of a residence; is that correct?

4    A.  Yes, sir.

5    Q.  All right.  And this defendant was not on the passenger

6    side, correct?

7    A.  He was not.

8    Q.  All right.  So, in fact, there's no evidence he threw that

9    gun, correct?

10   A.  Your client was in the vehicle, sir.

11   Q.  Well, I got that, but are you saying he threw it across and

12   through an open window?  Is that what the witness told you?

13            THE COURT:  Counsel, approach.

14        (Bench conference on the record.)

15            THE COURT:  Is the Government maintaining that

16   Mr. Summers was in possession of the gun that was thrown from

17   the car or the gun that was found in his house or the gun that

18   was found in the room with him?

19            MS. MCKENZIE:  We are arguing possession.  It's a

20   different argument as to each gun.

21            THE COURT:  Well, the question is are you maintaining

22   that he was in possession of the gun thrown from the car?

23            MS. MCKENZIE:  Constructive possession, yes.  I'm not

24   arguing that he necessarily was the one who threw the gun, but

25   he was driving the car from which the gun was thrown.

```
1              THE COURT:  Okay.

2              MS. MCKENZIE:  Our argument is that that is

3    constructive possession.

4              THE COURT:  And there were two or three other people

5    in the car with him?

6              MS. MCKENZIE:  Yes.

7              THE COURT:  Okay.

8        (End of bench conference.)

9    Q.  According to the complaint, a witness was interviewed,

10   correct?

11   A.  Yes, sir.

12   Q.  And did this witness say that that gun that was thrown out

13   of the vehicle was thrown by the driver?

14   A.  No, sir.  He said it came from the passenger side.

15   Q.  All right.  And the two people on the passenger side were

16   Ward and Brown, correct?

17   A.  Yes, sir.

18   Q.  Were they interviewed?

19   A.  They denied to speak with law enforcement.

20   Q.  Okay.  So they were not interviewed?

21   A.  No, sir.

22   Q.  All right.  But really you have no evidence that this man

23   possessed -- they can argue constructive possession, but you

24   have no evidence that this man possessed the gun that was thrown

25   out of the passenger side of the car, correct?
```

1   A.  No, sir.  That's not stated in the complaint.

2   Q.  Pardon me?

3   A.  No, sir.  The firearm that was thrown from the vehicle, it

4   was not stated in the complaint that he possessed that.

5   Q.  So you are not alleging he possessed it, correct?

6   A.  Not physical.  Constructive, yes.

7   Q.  Somebody else -- I understand you got an argument on

8   constructive, but somebody else possessed that gun that was

9   thrown out of the passenger side of that car, correct?

10          MS. MCKENZIE:  Objection.  That calls for speculation.

11          MR. EGGERT:  I'm trying to get to the bottom of the

12   case, Judge.

13          THE COURT:  Right.  Mr. Eggert, just ask him the basis

14   to believe that Mr. Summers was in possession, constructive or

15   otherwise, of the gun that was thrown from the car.  That's the

16   question, right?

17          MR. EGGERT:  Yes.  There was no evidence that he

18   physically or personally possessed it.  That's what I thought

19   the agent had just said.

20          THE COURT:  That's what he said.  He said that law

21   enforcement didn't see it thrown from the car and that the

22   witness said it came from the passenger side and did not

23   identify whoever threw it.  I think you got what you need.

24          MR. EGGERT:  Thank you.

25   Q.  Now, at some point you-all say that Mr. Summers entered

1    1728 Youngland, correct?

2    A.  Yes, sir.

3    Q.  All right.  And it turned out that there was another

4    gentleman who was at Youngland, correct?

5    A.  Yes, sir.  There were several people there.

6    Q.  How many people were at the Youngland Avenue -- is that a

7    house or an apartment?

8    A.  That's a house, sir.

9    Q.  How many people were there?

10   A.  I'm not sure of the exact number.

11   Q.  Was it three, four, eight?  Can you give me an estimate?

12   A.  It was approximately five.

13   Q.  Five people there.  Who resided there?

14   A.  I don't know the exact names.

15   Q.  Well, did Martez Banks live there?

16   A.  He did.

17   Q.  So he was actually a resident of that house, correct?

18   A.  To the best of my knowledge, yes, sir.

19   Q.  And you say there were other residents of that house?

20   A.  There were other people there.  I'm not sure if they were

21   residents there or not.  They were present at the time, yes,

22   sir.

23   Q.  All right.  I'm not asking you to give the names, but do you

24   have the names and where their addresses are?

25   A.  Yes, sir.

1  Q.  All right.  And so maybe they lived there, maybe they

2  don't?

3  A.  It's a possibility, yes, sir.

4  Q.  Well, we got five people there, and we know one of them did

5  live there, Mr. Banks, correct?

6  A.  Yes, sir.

7  Q.  In terms of weapons, you found one gun there; is that

8  correct?

9  A.  Yes, sir, inside the residence.

10  Q.  One gun inside the residence at Youngland, correct?

11  A.  Yes, sir.

12  Q.  You are not alleging Mr. Summers lived there, correct?

13  A.  That's correct.

14  Q.  When Mr. Summers was detained or arrested by you-all, he

15  didn't have a gun on him, correct?

16  A.  That's correct.

17  Q.  All right.  So there's a gun found, as I understand it,

18  according to this complaint, in a closet, is that right, at the

19  Youngland address?

20  A.  Yes, sir.

21  Q.  All right.  Now, I know you are saying Summers at some point

22  left a bedroom at the top of the stairs.  Is there any evidence

23  that Mr. Summers ever entered that closet?

24  A.  Yes, sir, the handgun that was found in there.

25  Q.  Besides the handgun, do you have a witness that says he was

1   there?

2   A.   Martez Banks stated that he was in that bedroom.

3   Q.   He was in that bedroom.  I asked you about the closet.  Do

4   you have any evidence that anybody saw him go in the closet?

5   A.   No, sir.

6   Q.   And let's talk about Martez Banks.  He lived there, correct?

7   He's a convicted felon; is that correct?

8   A.   I know he's on probation, yes, sir.

9   Q.   Which would indicate he's likely a convicted felon, right?

10  A.   Yes, sir.

11  Q.   So surely, you wouldn't have expected Martez Banks to tell

12  you, "That's my gun, I'm claiming the gun," would you?

13  A.   I can't put words in his mouth, sir.

14  Q.   Well, did Mr. Banks say that he had seen the defendant with

15  a gun?

16  A.   He was not asked that, sir.

17  Q.   He wasn't asked that?

18  A.   Not to the best of my knowledge.

19  Q.   Was anybody asked, did they see the defendant, Mr. Summers,

20  with a gun?

21  A.   They were asked if they saw Mr. Summers.  They also were

22  asked if they knew him.  Everybody denied knowing him that was

23  there that day.

24  Q.   Okay.  And just to follow up on that answer, according to

25  you-all, Mr. Summers entered the house, correct?

1    A.   Yes, sir.

2    Q.   And then were you present when he allegedly exited the

3    house?

4    A.   Yes, sir.

5    Q.   Okay.  So did you see him come from the house?

6    A.   Yes, sir.

7    Q.   So you asked people in the house, "Did you see Summers in

8    the house," but you didn't ask them, "Hey, did he have a gun on

9    him?"

10   A.   I did not personally.

11   Q.   Well, do you know of any agent that did?  Do you have any

12   information to that effect?

13   A.   I do not.

14   Q.   All right.  Now, at some point was a weapon found near a

15   dollar store?

16   A.   Yes, sir.

17   Q.   And was that the weapon that was supposedly thrown from the

18   passenger side of the car, or was that another weapon?

19   A.   That was another weapon, sir.

20   Q.   Pardon me?

21   A.   That was another firearm, sir.

22   Q.   That was another firearm.  So we have got one thrown from

23   the passenger side, right?

24   A.   Yes, sir.

25   Q.   Just keeping track.  Now, we have got one near the dollar

1  store.  Was Mr. Summers ever near the dollar store?

2  A.  Sir, the dollar store parking lot where the firearm was

3  found?

4  Q.  Yes.

5  A.  There's a wooden fence that separates that parking lot and

6  the residence.  It was found approximately about a foot off of

7  that wooden fence on the Dollar General side.

8       THE COURT:  Ms. McKenzie, is the Government

9  maintaining that Mr. Summers was in possession of the firearm

10  found by the fence at the dollar store?  Ms. McKenzie?

11       MS. MCKENZIE:  I'm sorry.  This is the gun that was on

12  the dollar store side of the fence?

13       THE WITNESS:  That's correct.

14       MS. MCKENZIE:  Again, Your Honor, the argument would

15  be constructive possession from inside the vehicle.  I'm not

16  necessarily suggesting that Mr. Summers went into the dollar

17  store parking lot to deposit the gun there, no.

18       THE COURT:  Well, you have not answered my question.

19  Are you basing the charge of felon in possession in part on this

20  handgun that was found by the dollar store fence?

21       MS. MCKENZIE:  To the extent that it is the

22  Government's belief that an inference can be drawn from the

23  evidence that that gun was in the possession of the co-defendant

24  who came from the car who was captured in the dollar store

25  parking lot.  There were three men in the car.  They all bail

1    out, and guns are found in various places.  It's our argument

2    that all of those guns originally were inside Mr. Summers' car.

3    It's an attenuated --

4            THE COURT:  The answer is "yes" or "no."  Are you

5    maintaining that he was in constructive possession of this, I

6    think it's a Glock, that was found by the fence in paragraph 7

7    of the complaint?

8            MS. MCKENZIE:  For today's purposes, no.

9            THE COURT:  No?  That's what I need to know.

10       All right.  Mr. Eggert.

11           MR. EGGERT:  In other words, that gun is not being

12   attributed to this defendant, if I understood that answer

13   correctly.

14           THE COURT:  That's what I understood Ms. McKenzie to

15   say.  You said for today's purposes you are not alleging that he

16   was in constructive possession of that handgun, correct?

17           MS. MCKENZIE:  Correct.  Further investigation,

18   further evidence may change the Government's position on that.

19           THE COURT:  Okay.  That's fine.  I'm trying to find

20   out what all is in play for today.

21       Mr. Eggert.

22           MR. EGGERT:  Judge, I won't -- I won't pursue that or

23   follow up on that because that's not a subject then of your

24   determination as to probable cause.

25   BY MR. EGGERT:

Hicks - Cross                                                          20

1   Q.  Now, you then -- I just want to ask you a couple more

2   questions about the entry on Youngblood.  Was that a forcible

3   entry?

4   A.  Youngland.  Yes, sir.

5   Q.  Forcible?  Broke down the door?

6   A.  The door was forced in, yes, sir.

7   Q.  By the defendant?

8   A.  No, sir.

9   Q.  How did the defendant -- how did he enter?

10  A.  He was observed running in the back of the residence.

11  Q.  Pardon me?

12  A.  He was observed running into the rear of the residence.

13  Q.  Was the door open?

14  A.  Not --

15  Q.  Was it unlocked?

16  A.  I did not observe that.

17         THE COURT:  Did officers observe him go into that

18  house through the back door?  Is that what you are saying?

19         THE WITNESS:  Yes, sir.

20  Q.  Did any of the residents complain?  Did they call police

21  and say, "We have got a burglar in the house," or anything like

22  that?

23  A.  Not to the best of my knowledge, sir, but it happened within

24  a matter of seconds.

25  Q.  I would like to go, I guess -- did you go to the -- you

1    referred to this place as an apartment.

2              THE COURT:  Before you go to that, how did law

3    enforcement get into the house there on Youngland?

4              THE WITNESS:  Sir, law enforcement -- once we grouped

5    together, there was two individuals detained out front -- one

6    out front and one in Dollar General.  The investigator said, "I

7    saw him run inside.  He's inside."  The door was kicked -- the

8    front door was kicked in.  All the occupants were called out,

9    one of those being your client.

10             THE COURT:  And you-all had been pursuing Mr. Summers

11   from the traffic pursuit; is that right?

12             THE WITNESS:  Yes, sir.

13             THE COURT:  All right.  Go ahead.

14             MR. EGGERT:  I'm sorry.  I didn't understand his

15   answer to your last question, Your Honor.

16             THE COURT:  I was trying to figure out how they went

17   into the house.  My question was, "Were you in pursuit of him

18   from the traffic pursuit?"

19             MR. EGGERT:  I see.

20             THE COURT:  And then how much time passed from when

21   he jumped from the car and made entry into the house?  Do you

22   know?

23             THE WITNESS:  The vehicle -- from where they bailed

24   out of the vehicle and took off on foot to the residence that

25   they entered was approximately a block.  It was through

1    someone's front yard, through the backyard, over a fence, and

2    into the rear of the residence.

3              THE COURT:  Okay.

4              THE WITNESS:  A matter of seconds.

5              THE COURT:  Mr. Eggert, does that clear it up?

6              MR. EGGERT:  Thank you, Judge.

7    BY MR. EGGERT:

8    Q.  What's the distance from Wilson where allegedly the car left

9    from and Youngland Avenue?

10   A.  I'm not sure of the exact distance.  I would have to refer

11   to a map.

12   Q.  Is it a mile, half a mile, few blocks?

13   A.  It's not very far.

14   Q.  Not very far.  All right.  Finally, you talked about an

15   apartment that you-all found at Zelma Fields.  Did you go

16   there?

17   A.  I did.

18   Q.  And when you-all went there, was anybody there?

19   A.  No, sir.

20   Q.  Where did you find the firearm?

21   A.  It was located in the upstairs bedroom, the only room in the

22   residence that had an actual bed, inside the nightstand next to

23   the bed in one of the drawers.

24   Q.  How many rooms are there in that residence?

25   A.  I believe there's two bedrooms, but only one actually had an

1    established bed and bedroom in it.

2    Q.  Is it -- it's an apartment?

3    A.  Apartment-type, a rental, yes, sir.

4    Q.  So it's a rental apartment?

5    A.  Yes, sir.

6    Q.  Okay.  And who rented it?

7    A.  The lease was in Mr. Summers' mother's name.

8    Q.  It was not in Mr. Summers' name?

9    A.  No, sir.

10   Q.  Now, you had mentioned investigation and surveillance, and

11   so forth.  Had you surveilled that address?

12   A.  I had.

13   Q.  Had you surveilled it that day?

14   A.  I had not.

15   Q.  Has there been any testing done of the gun found there at

16   Zelma Fields?

17   A.  I would have to double check.  I believe that gun has been

18   submitted through LMPD's CSU Unit for testing.

19   Q.  For fingerprints?

20   A.  Yes.  CSU tests for fingerprints and DNA.

21   Q.  Do you know if any fingerprints were lifted?

22   A.  Off the firearm?

23   Q.  Yes.

24   A.  No, sir, not at this point.

25   Q.  Or any comparisons made?  You don't know?

1    A.   I don't know if they are finished with it or not.

2    Q.   Was there any ammunition in this firearm?

3    A.   No, sir.

4    Q.   Just a few more questions.  I think you have already

5    answered about the firearm found in the parking lot at Dollar

6    General, right?

7    A.   Yes, sir.  If I could add to your last question, I believe

8    the firearm that was recovered from Zelma Fields has not been

9    tested.  I instructed them not to do so.  I believe the matching

10   Taurus that was at Youngland has been.  They are the same make,

11   model, and caliber.

12   Q.   Okay.  They are different firearms, correct?

13   A.   Yes, sir.

14   Q.   All right.  And you say the Taurus found at Youngland has,

15   and what were the results of that?

16   A.   We don't have the results yet.  I do not have the results

17   yet.

18   Q.   When you say that it's been tested, what do you mean?  That

19   prints had been lifted off?

20   A.   When the firearm is processed at LMPD's CSU, they handle --

21   I'm not sure their backlog or how long it takes for them to get

22   their prints back.

23   Q.   I'm a little --

24   A.   They test it for latent prints, and they also test it for

25   touch DNA.  I do not have those results.

1  Q.  Okay.  Just to be clear, actually you are not sure it's been

2  tested yet?

3  A.  It was taken there and processed, yes, sir.

4  Q.  Well, you would have Mr. Summers' fingerprints available

5  immediately.  Can you tell us if there's fingerprints on the gun

6  and who they belong to?

7  A.  I did not process the firearm, and CSU has not provided us a

8  report saying otherwise that I have seen.  It's not an

9  instantaneous thing.  It takes -- it depends on their backlog

10  and everything.  The process is when we drop the gun off, they

11  don't turn around and look at the prints and immediately have an

12  answer for us, no, sir.

13  Q.  Okay.  But again, and I don't mean to belabor this point,

14  but you said that it was processed.  What did you mean that the

15  gun was processed?

16  A.  When it's processed, they check it for prints -- I can't

17  tell you how they process the firearm, sir.  I'm not a

18  technician at their lab.  I would misspeak if I did.

19          THE COURT:  Well, I think the question and the

20  confusion is coming from whether it was submitted for

21  processing, which obviously it was, or do you know that it's

22  actually been processed?

23          THE WITNESS:  I do not know.  I know it's been

24  submitted for processing.

25          THE COURT:  Okay.  In any event, you haven't gotten

1    any reports back?

2              THE WITNESS:  That's correct.

3              THE COURT:  Okay.  Mr. Eggert.

4    Q.  So of these guns found, you'll agree with me one -- just so

5    I have got this straight in my mind, one is thrown from the

6    passenger side of the vehicle, correct?

7    A.  Yes, sir.

8    Q.  Another is found in the dollar store parking lot, and you

9    are not even alleging or attributing that to this defendant,

10   right?

11   A.  That's correct.

12   Q.  Then you got another gun found at Youngland in a closet, and

13   you'll agree that Mr. Summers does not live there, correct?

14   A.  That's correct.

15   Q.  But another convicted felon does, Mr. Banks, correct?

16   A.  That's correct.

17   Q.  And four other people happened to be in that residence at

18   the time, right?

19   A.  Approximately.

20   Q.  And finally, a residence at another location or an

21   apartment, do you know how many people had access to that

22   apartment?

23   A.  I do not.

24   Q.  I gather other people had access to that apartment at Zelma

25   Fields?

 1   A.  I don't know the answer to that.  I don't know who had

 2   access to it, sir.

 3   Q.  Did Mr. Summers make any statements to you?

 4   A.  He stated when we were outside next to the residence that he

 5   didn't know the occupants inside.

 6          THE COURT:  Are you talking about the residents on

 7   Youngland?

 8          THE WITNESS:  Yes, sir.

 9          THE COURT:  Okay.

10          MR. EGGERT:  I think that's all I have got, Judge.

11          THE COURT:  Ms. McKenzie.

12          MS. MCKENZIE:  Just briefly, Your Honor.

13                     REDIRECT EXAMINATION

14   BY MS. MCKENZIE:

15   Q.  Special Agent Hicks, are you aware of Mr. Summers occupying

16   or having occupied any other apartments leased in his mother's

17   name?

18   A.  I am.

19   Q.  Okay.  Can you tell me where?

20   A.  He occupied a residence that a search warrant was conducted

21   at in, I believe, February.

22   Q.  Okay.

23   A.  That was also leased in his mother's name.

24          THE COURT:  Was the question any other apartment?

25          MS. MCKENZIE:  Yes.

1           THE COURT:  Beyond Zelma Fields?

2           MS. MCKENZIE:  Yes.

3           THE COURT:  Okay.

4    Q.  What else was found in the Zelma Fields --

5           THE COURT:  Hold on.  So I understand your answer, you

6    said "yes" in February -- I'm confused by that answer.  Are you

7    saying that there's another apartment that his mother leases

8    where he stays or has stayed?

9           THE WITNESS:  Prior, yes, sir.  Not knowledge of any

10   current, but prior, yes, sir.

11          THE COURT:  At the time of this incident that we are

12   here on today, do you know, was he staying anyplace other than

13   Zelma Fields?

14          THE WITNESS:  I don't know if he was staying any other

15   place, sir.

16          MS. MCKENZIE:  I think I can -- maybe I gave him a bad

17   question.

18          THE COURT:  Did you establish -- what was your

19   understanding of his primary place of residence on April 12th,

20   2017?

21          THE WITNESS:  That he resided at 7924 Zelma Fields.

22          THE COURT:  How did you establish that?

23          THE WITNESS:  Through the -- during the search of the

24   residence, there was male clothing not consistent with his

25   mother's.  There was not observed any female clothing there.

1    The shoe sizes matched all of the same shoe size that

2    Mr. Summers wears.  Indicia of ownership to include luggage with

3    his name on it with airline tags, court documents, impound

4    forms, all with Mr. Summers' name on it.

5             THE COURT:  All right.  That's set forth in the

6    affidavit.

7         All right.  Go ahead, Ms. McKenzie.

8    BY MS. MCKENZIE:

9    Q.  You answered my next question.  The luggage that was found

10   inside the apartment, did that have airline information with

11   Mr. Summers' name on it?

12   A.  It did.

13   Q.  And the court documents, did those relate to a vehicle

14   belonging to Mr. Summers?

15   A.  It did.

16   Q.  You referenced his shoe size.  Did you note of the shoes

17   that were in that apartment on Zelma what size they were?  Were

18   they men's shoes?

19   A.  Yes, ma'am.

20   Q.  Okay.  Were they all of a particular size?

21   A.  Yes, ma'am.  They were all 11 or 11 and a half.

22   Q.  Okay.  Did you or any other investigators gather any

23   information about what size shoe Mr. Summers wears?

24   A.  We did.  One of the investigators checked his shoe size, and

25   it was consistent with 11 or 11 and a half.

1   Q.   Okay.  So the shoes he had on at the time of arrest?

2   A.   That's correct.

3   Q.   Okay.  I want to make sure I understand.  Is it your

4   understanding that Mr. Summers previously lived at another

5   apartment leased in his mother's name?

6   A.   That's correct.

7   Q.   Okay.  He does not live there now?

8   A.   That's correct.

9   Q.   The entry into the home on Youngland, you described it as

10   all taking place within a matter of seconds?

11   A.   Yes, ma'am.

12   Q.   I think Mr. Eggert asked you a question about was it a

13   forcible entry.  Are you aware, was Mr. Summers charged by

14   Louisville Metro Police in connection with his entry into that

15   home?

16   A.   He was.

17   Q.   What was he charged with?

18   A.   I believe it was burglary.

19   Q.   Okay.  Roman Brown -- Mr. Eggert asked you about the

20   other individuals in the car.  Roman Brown, is he a convicted

21   felon?

22   A.   He is.

23   Q.   Okay.  Who else was in the car?

24   A.   Byram Ward.

25   Q.   Okay.  Is Mr. Ward a convicted felon?

1   A.  He is not, but he's currently under indictment for a

2   felony.

3   Q.  And the home where police first observed Mr. Summers leaving

4   on Wilson, whose home was that?

5   A.  It's the residence that William Stevenson is on HIP at.

6   It's his mother's residence.

7   Q.  Is Mr. Stevenson currently under indictment?

8   A.  Yes, sir.

9   Q.  Are you -- Mr. Eggert asked you about your investigation at

10  this location.

11          THE COURT:  Which location?

12          MS. MCKENZIE:  The Wilson Avenue address.

13          THE COURT:  All right.

14  Q.  What LMPD division is Wilson Avenue a part of?

15  A.  I believe it's in the Second, but I'm not for sure.

16  Q.  Okay.  You mentioned that your task force is supposed to

17  work on violent crimes.  Would you consider this to be an area

18  that has a high rate of violent crime?

19  A.  Yes, ma'am.  Based off LMPD homicide statistics, the Second

20  Division alone has had 16 homicides since January.  The

21  California Park area where we were doing surveillance that day

22  has had six homicides and eight shootings based off their

23  statistics.

24  Q.  Mr. Stevenson or any of the other individuals whose names

25  have been spoken in connection with this investigation, are

1    these individuals that you were aware of before April 13th?

2    A.  They are.

3    Q.  April 12th?

4    A.  They are.

5    Q.  Martez Banks, do you know what he is on HIP for?

6    A.  I believe he's on probation for burglary first.

7    Q.  What time of day did all this take place?  Was it morning,

8    afternoon, night?

9    A.  It was afternoon.

10   Q.  Okay.  Was there any evidence in that apartment on Zelma

11   that a female lived there?

12   A.  No, ma'am.

13   Q.  Was there any evidence at that apartment on Zelma that

14   anyone other than the occupant of that bedroom lived there?

15   A.  No, ma'am.

16           MS. MCKENZIE:  Thank you.

17           MR. EGGERT:  Judge, can I follow up?

18           THE COURT:  Please.

19           MR. EGGERT:  Thank you.

20                    RECROSS-EXAMINATION

21   BY MR. EGGERT:

22   Q.  Agent, you had talked about shoe size.  Maybe it's just the

23   shoes I wear, but my shoes give a size.  They don't say 11 or 11

24   and a half, all right?  So what was the size that you are

25   talking about?  Was it 11 or 11 and a half, or did the shoes say

1   11 or 11 and a half?

2   A.  No, sir.  There was multiple, multiple pairs of shoes.  If I

3   had to estimate, there was probably close to 50 pairs of shoes.

4   The majority of them were 11; however, there were a few 11 and a

5   halves, I believe.

6   Q.  All right.  This is at Zelma Fields; is that correct?

7   A.  That's correct.

8   Q.  All right.  And the defendant had 11 and a half or 11 on

9   him?

10  A.  The day of the arrest?

11  Q.  Yes.

12  A.  I believe they were 11's, but I'm not positive.  That was a

13  different investigator that checked that shoe size.

14  Q.  You are not sure?

15  A.  No, sir.

16  Q.  All right.  And regardless -- okay.  So we don't know.  Fair

17  to say you don't know if he had 11 or 11 and a halves?

18  A.  I do not personally know.

19  Q.  You talked about there was male clothing there, not female

20  clothing, but I think you already stated that you don't know who

21  had access to that place, correct?

22  A.  That's correct.

23  Q.  All right.  You talked about that his mother had rented

24  other places for Mr. Summers, correct?

25  A.  That's correct.

1    Q.  And, in fact, as recently as February, police had entered

2    one of those residences, correct?

3    A.  That's correct.

4    Q.  All right.  And what was that residence?  Was it Zelma

5    Fields or another one?

6    A.  It was a different residence.

7    Q.  It was a different residence, correct?

8    A.  Yes, sir.

9    Q.  All right.  And, in fact, when you entered that residence

10   which was supposed to have been the defendant's, was the

11   defendant there, or were other people there?

12   A.  No one was there at the time.

13   Q.  Not the defendant, correct?

14   A.  That's correct.

15   Q.  All right.  You talked -- they asked you about this Wilson

16   Avenue and a high-crime area, but also people live on Wilson

17   Avenue, do they not?

18   A.  Yes, sir.

19   Q.  Okay.  There's people who live there, residents, right?

20   A.  Yes, sir.

21   Q.  All right.  You talked about all these homicides.  You are

22   not trying to pin any of these homicides on him, are you?

23   A.  No, sir.

24   Q.  Or shootings, you are not trying to put those on him,

25   correct?

1    A.  No, sir.

2    Q.  All right.  So basically, he's visiting someone in a

3    neighborhood, is what he's doing, correct?

4    A.  I'm not sure what he was doing there, sir.

5    Q.  Well, he visited, according to you, Mr. Stevenson, correct?

6    A.  He was at the residence, yes, sir.

7    Q.  Well, are you saying he entered illegally, or did anyone

8    complain that he was there?

9    A.  No, sir.  I'm just stating I don't know what his business

10   was there.  I can't state on your client's behalf.

11   Q.  You mentioned that Mr. Banks you thought might be a felon,

12   but then you said in response to the prosecutor's questions

13   Burglary I.  You are aware Burglary I is a Class B felony,

14   aren't you?  Aren't you?

15   A.  Yes, sir.

16   Q.  It carries 10 to 20 years, correct?

17   A.  Yes, sir.

18   Q.  So there's no doubt about Mr. Banks' felony status if he's

19   convicted of a Class B felony, correct?

20   A.  Yes, sir.

21   Q.  The prosecutor asked you about who was under indictment or

22   who was on HIP.  You don't know of any prohibition against

23   Mr. Summers visiting someone who is on HIP, do you?

24   A.  Not personal knowledge, no, sir.

25   Q.  And do you have any knowledge that he's not supposed to see

1    somebody who might be supposedly, allegedly under indictment?

2    A.  No, sir.

3    Q.  And you will certainly agree with me just because you are

4    under indictment doesn't mean you are guilty, right?

5    A.  That's correct.

6    Q.  Thank you.  Now, when you talked about this Zelma Fields

7    that the Court asked you about, when was the last time you

8    surveilled that particular address?

9    A.  I don't recall the exact date.

10   Q.  Well, do we have any kind of estimate?  Was it a week, a

11   month, weeks?

12   A.  I would have to refer to my case file at the office, sir.

13   Q.  Well, you are claiming he lived there.  When was the last

14   time a law enforcement officer saw the man there?

15   A.  There was multiple law enforcement officers that have

16   conducted surveillance there.  They have seen him there

17   recently, yes, sir, but I can't say that I have.

18   Q.  Recently.  A week, a month?

19   A.  Electronic surveillance, yes, sir.  They put it there very

20   recent.

21   Q.  Really?  What was the electronic surveillance?  You

22   mentioned it.  What was the electronic surveillance?

23   A.  GPS phone pings.

24   Q.  Pardon me?

25   A.  Phone pings.  GPS phone pings.

1    Q.   So you had a GPS on his phone?

2    A.   Yes, sir.

3    Q.   Besides electronic monitoring, any other monitoring or

4    surveillance at that address?

5    A.   Physical surveillance, yes, sir.

6    Q.   Okay.  And you are saying that was recently, but we don't

7    know when?

8    A.   I don't recall exact dates, no, sir.  We surveil a lot of

9    addresses.  I would have to refer to notes.

10   Q.   Finally, are you contending that the GPS puts him in the

11   apartment or in the area of the apartment?

12   A.   The GPS would put him in the area, but the physical

13   surveillance of officers there seeing him with their own eyes

14   was putting him there in the apartment.

15   Q.   Finally, you mentioned -- I think the prosecutor asked you

16   about you are aware of LMPD charges on burglary first.  That

17   would be that Mr. Banks would be your witness, your victim, to

18   complain that someone burglarized his premises.  Is that the

19   basis of the enter or remain without permission with the intent

20   to commit a crime?  Is that your allegation here?

21   A.   No, sir.  Actually, I believe it's Mr. Banks' grandmother

22   who was the actual resident, the owner of the residence.

23   Q.   Was she there?

24   A.   She was.  I don't recall her name.

25   Q.   And Mr. Banks was there, also?

1    A.   Yes, sir.

2             MR EGGERT:  That's all I have, Judge.  Thank you.

3             THE COURT:  Ms. McKenzie?

4             MS. MCKENZIE:  I don't have anything further, Your

5    Honor.

6             THE COURT:  All right.  You can step down.  Thank

7    you.

8         Hold on.  Let me ask you something.  Did your investigation

9    indicate that Mr. Summers knew Mr. Banks?

10            THE WITNESS:  I was not aware of it before that day,

11   sir.

12            THE COURT:  Okay.  Thank you.

13            THE WITNESS:  Yes, sir.

14            MR. EGGERT:  Judge, can I follow up on that?

15            THE COURT:  Sure.

16   BY MR. EGGERT:

17   Q.   Isn't it a fact that that Youngland Avenue address, one of

18   the persons in the car is related to someone who lives at that

19   residence?

20   A.   I'm not aware of that, sir.

21   Q.   Did Banks continue to say that he didn't know this

22   defendant, Ward, or the third person, Roman Brown?

23   A.   I was not there for that question, nor did I ask him.

24            MR. EGGERT:  Nothing further.

25            THE COURT:  You can step down.  Thank you.

1      Ms. McKenzie, I'll hear from you.

2           MS. MCKENZIE:  Thank you, Your Honor.  Your Honor, I

3   would ask that the Court find probable cause -- find that

4   there is probable cause to believe that Mr. Summers has

5   committed a violation of the Gun Control Act, Title 18, Section

6   922(g)(1).

7      There were several guns discussed in the affidavit and the

8   testimony today.  Certainly, the arguments as to possession are

9   all different.  But keeping in mind that probable cause is a

10  lower standard and we are at the initial stages of this case, I

11  think that the facts that the Court has in front of it do carry

12  that burden.

13     We start with officers observing Mr. Summers' vehicle.  It's

14  at a house that they are watching.  They attempt to effect a

15  traffic stop.  There's a stop sign that he blows through.  They

16  activate the emergency equipment.  He runs another stop sign and

17  just keeps going.

18     The description is that they are traveling at a fairly high

19  rate of speed, at least for this neighborhood in the middle of

20  the afternoon, and flight in any court is evidence of a

21  consciousness of guilt.  So I think that this unprovoked flight

22  is certainly circumstantial evidence that Mr. Summers knew what

23  was in that car and knew what was being thrown from that car as

24  it was fleeing law enforcement.  That's why they all bailed out

25  of the car.  That's why he ran out of the car through someone's

1    yard, through another homeowner's yard, and into the home of

2    someone who certainly didn't invite him in.

3         When he's found, he has a holster in his pants, an empty

4    holster.  That holster fits the Taurus 9mm that was found in the

5    apartment, and it also fits the Taurus 9mm that was found inside

6    the bedroom from which he was observed to come at the house on

7    Youngland.  As the affidavit states, when the police go inside

8    the house, they see Mr. Banks come from one bedroom, Mr. Summers

9    come from another, and this is the bedroom where the gun was

10   found.

11        So he's wearing an empty holster that fits two of the guns

12   that we are talking about today.  Again, I think this is strong

13   circumstantial evidence of knowing possession of a firearm.

14        Going to the apartment -- I'm sorry, I completely lost the

15   name -- the Zelma Fields apartment, while there wasn't testimony

16   that Agent Hicks observed Mr. Summers coming out of that

17   apartment that day, there's, again, ample circumstantial

18   evidence that this was where he was living.  His luggage, his

19   airline records, his documents pertaining to a truck that had

20   been impounded are all inside the residence.  Male clothing,

21   shoes that fit him, and the gun is found in the nightstand.

22        Now, taking all of this evidence, the totality of it all --

23   I think that certainly there are more blanks to be filled in

24   with this investigation, but keeping in mind what the standard

25   is, I think the evidence meets that standard, and the Court does

1   have enough to find probable cause that he was in possession

2   of -- I would submit that he was in possession of all three of

3   those weapons, the one thrown from his car, the one found in the

4   home that matches the holster he was wearing, and the other

5   found inside his apartment that matches the holster he was

6   wearing.

7        There is no other evidence before the Court to explain why

8   this young man runs from the police when they simply try to

9   effect a traffic stop.  He didn't have warrants.  There was

10  nobody in the car that had warrants.  He ran from the police

11  because he knew he had guns and he knew that that could send him

12  to prison.  I think that the reasonable inferences to be drawn

13  from that evidence are that he was in possession of a firearm

14  that day.

15           THE COURT:  All right.  Mr. Eggert.

16           MR. EGGERT:  Thank you, Judge.  Your Honor, at the

17  outset, I would like to point out how the Government's case has

18  morphed from the complaint.  In the complaint which they

19  presented to you, Your Honor, they never alleged that the

20  defendant lived at Zelma Fields.  The word they used was

21  "utilized," because, in fact, he didn't live there.  But now at

22  this hearing, they don't use the word "utilized" or "associated

23  with."  Now, all of a sudden, he lives there.  Just because some

24  property is there of his does not mean he lives there.  I think

25  that word "utilized" is quite different from "resides," and

1    that's the word that they used in paragraph 8 when they

2    presented the complaint to you.

3         Judge, just to go back, there may be many reasons people run

4    from police, but certainly one of them is evident from their own

5    case.  If you are on probation, it's not a crime, but it's a

6    violation to be in the company of someone who is a convicted

7    felon.  According to their proof, Mr. Brown is a convicted

8    felon.  So that would certainly be a reason why anyone would get

9    upset or panic or run.

10        Regarding Youngland, Judge, let's remember no law

11   enforcement officer saw him go into the bedroom.  They don't

12   know what bedroom he went into.  They don't know what bedroom he

13   came out of.  He apparently walked out of there, and said, "Here

14   I am," and surrendered, if that's the word you want to use, but

15   nobody even saw him go into the room in terms of law

16   enforcement.

17        The person they are basing that is on Martez Banks, a

18   convicted felon himself who, if he said it was his gun, would

19   be admitting to a crime, in fact admitting to the same crime

20   that landed Mr. Summers here.  So now Martez Banks with his

21   Burglary I and on probation is supposedly so reliable that they

22   can say, "Hey, that gun belongs to him."

23        The holster, I suppose, is suspicious, but nothing more,

24   because I suspect there's numerous guns that would fit that

25   holster.  The fact is they can't claim Youngland is his address

1    because it's not.  They don't know where he went in there.  They

2    have never said -- even Banks didn't say he went in the closet

3    where the gun was found, and Banks himself, along with the four

4    other people there, would have many reasons to say that the gun

5    wasn't theirs.

6         So that leaves us, Judge, you have the gun thrown from the

7    car, thrown from the passenger side.  I don't know what their

8    evidence of constructive possession is.  Just because you're

9    present or around or near it doesn't make you guilty of

10   constructive possession.  Obviously, someone else had that gun.

11   Someone else pitched that gun, and someone else threw it, even

12   assuming he knew it.  That's not evidence.

13        Really, what they have done here respectfully, and I

14   appreciate the Court's questions, they have gone, "Eeny, meeny,

15   miny, moe, you pick a gun, and we will call it possession of a

16   handgun by a convicted felon.  We don't know really what he

17   possessed really or constructively, but we have got four guns

18   here.  Let's throw out one.  He's probably got one of the

19   three."

20        Judge, we don't think that this case -- I know it's a low

21   standard, but we don't think in this case they have met that

22   standard.  Yes, they have some gaps to fill, big gaps,

23   significant gaps, and we would ask the Court not to find

24   probable cause.  Thank you, Your Honor.

25             THE COURT:  Well, there's been no testimony that

1   anyone found the defendant in actual possession of a firearm, so

2   this is a constructive possession case.  Constructive

3   possession, as I understand the law, exists when a person

4   doesn't have actual possession, but instead, I think the wording

5   is knowingly has the power and the intention at a given time to

6   exercise dominion and control over an object, either directly or

7   through others.  There's case law in the Sixth Circuit that says

8   that a person who has dominion over the premises where the

9   firearm is located is sufficient to establish constructive

10  possession, not just being there, but dominion and control over

11  the premises.

12      So let's start with the handgun that was found at Zelma

13  Fields.  We have heard testimony that through physical and

14  electronic surveillance the Government has placed Mr. Summers

15  there, and there's sufficient evidence to believe at this point

16  that that was his residence.

17      In addition to the surveillance that was done, once the

18  warrant was served, the place was set up with -- two bedrooms,

19  one was set up with a bed, and in that bedroom they found

20  documents with his name on it.  They found clothing in his size

21  and shoes in his size, U.S. Mail that was addressed to him.  The

22  gun was in the nightstand.  That's sufficient to establish

23  probable cause for constructive possession of the firearm at the

24  Zelma Fields residence.

25      The gun found at Youngland, certainly the evidence is

1    thinner there.  It does allege in the affidavit, which was

2    adopted as the officer's testimony, that officers actually saw

3    Mr. Summers come out of the bedroom where the handgun was found.

4    He did run from the police both in the vehicle and on foot, and

5    he had on his person a holster that would fit that gun.

6        Probable cause only requires a showing that it's more likely

7    than not.  And I think -- while it's a long way from proof

8    beyond a reasonable doubt, I think there's probable cause on the

9    gun on Youngland.  There's not probable cause on the gun that

10   was thrown from the vehicle.  Again, simply being present in the

11   vehicle doesn't put him in actual or constructive possession of

12   that weapon.  So there's no probable cause there as established

13   from the evidence of this hearing.

14       I would note that the complaint only charges a single count

15   of possession by a felon.  So I think they have met the probable

16   cause standard.

17       When is the matter going to be presented to the grand

18   jury?

19           MS. MCKENZIE:  Your Honor, I expect to present it

20   during the first grand jury session in May.

21           THE COURT:  All right.  Should there be an indictment,

22   do we have an arraignment date?

23           DEPUTY CLERK:  May 25th at 9:30.

24           THE COURT:  All right.  Has the Government -- you have

25   moved for detention, right?

1          MS. MCKENZIE:  If we haven't, I do now.

2          THE COURT:  Are you prepared for a hearing this

3   afternoon?

4          MR. EGGERT:  I am, Judge.

5          THE COURT:  All right.  Let's go forward with that.

6   This would not be or would be a presumption case?

7          MS. MCKENZIE:  It would not be, Your Honor.

8          THE COURT:  That's what I thought.

9      Go ahead, Ms. McKenzie.  It's your burden.

10         MS. MCKENZIE:  Yes, Your Honor.  Thank you.

11     I believe under the factors set forth in the statute, the

12  Court has heard and has in front of it more than sufficient

13  evidence to find that Mr. Summers is a danger to the community

14  and a flight risk.

15     I will start with the first factor, obviously the nature

16  and circumstances of the offense.  This is an offense that

17  involves flight, flight in a vehicle and on foot.  This is

18  relevant not just to flight.  I think the circumstances of the

19  offense are also relevant as to the danger he presents to the

20  community.

21     As Mr. Eggert correctly stated, this is a neighborhood where

22  people live, and the people who live in this neighborhood and

23  whose children walk home from the bus stop don't expect to have

24  people running from the police and pitching guns all over the

25  place in the middle of the afternoon.

1    Nobody has argued that Martez Banks, who lived in the house

2  on Youngland, is a saint.  But the point is Mr. Summers didn't

3  just run from the police, he ran from the police and then

4  invaded someone else's home.  That someone else, the person who

5  lives in that home, has a right not to have him run in the door,

6  no matter what their criminal history looks like.

7    I would say at a minimum Mr. Summers is associating with

8  and -- he's associating with individuals who have serious

9  criminal histories at a minimum.  He has shown a pattern of

10  offenses with weapons.  Obviously, this goes to the danger that

11  he presents.

12    But again, going back to whether or not he's a flight risk,

13  particularly whether or not he has -- he presents a danger of

14  re-offending, I note that his criminal history includes prior

15  offenses with guns.  The case -- the 2013 indictment that

16  makes him a convicted felon, he was arrested in 2013 in

17  possession of a gun while he had pending charges for concealed

18  weapons.  There's a 90-day contempt of court that appears on his

19  criminal history that is associated with the timing of that

20  arrest.

21            THE COURT:  Can you point that to me?

22            MS. MCKENZIE:  It's on page 3 of the probation

23  report.

24            THE COURT:  Okay.

25            MS. MCKENZIE:  So 13-M-6603 was pending at the time of

1    the subsequent arrest, which was in -- the testimony was that

2    the arrest date was in July of 2013, and that timing is

3    consistent with the finding of contempt of court.

4        So he's got probation violations.  He has prior violations

5    of court orders.  He has a history of being around weapons,

6    being around people with serious criminal histories, violent

7    criminal histories.

8        I think that certainly flight is an issue from the

9    circumstances, from the facts of this case, but maybe more

10   importantly, the danger that he presents to the community is

11   obvious.  It is also less obvious, but also included in the

12   concept of danger, that he simply presents a risk to re-offend.

13       I agree with the probation finding that there are no sets of

14   conditions that could adequately ensure his reappearance and

15   protect the community.  He's noted to be associated with some

16   pretty dangerous individuals, according to the probation

17   report.

18       For all of those reasons, I think the Court has sufficient

19   evidence to find that he is a flight risk and certainly that he

20   is a danger to the community and should be detained.

21       The fact that -- I'm sorry.  I missed one point.  The fact

22   that he was on felony probation at the time of his arrest is

23   specifically set out in the statute for the Court to weigh.  I

24   think that it weighs heavily in favor of detention.

25           THE COURT:  Mr. Eggert.

1          MR. EGGERT:  Judge, let me say they are asking for

2    really something that was supposed to be the exception as the

3    norm.  They are asking you to detain somebody without bond, no

4    bond, in a nonpresumption case.  Of course, when they talked --

5    the original detention was for someone who might flee.  They

6    have taken that and gone to basically a handgun by a felon case

7    and say, "Lock him up."

8          Let's talk about some of their arguments.  First of all,

9    he's got one prior felony.  He was off supervision, okay?  One

10   prior felony, off supervision, when this occurred.  Two, they

11   have gone back to 2013, Judge.  In that particular case, he was

12   charged with a misdemeanor.  I don't know what the contempt was

13   about, but the misdemeanor occurred in 2013.  He had a pending

14   misdemeanor.  The sentence he got in 2013 was credit time

15   served, is what he got.  So they are trying to use a credit time

16   served sentence to say, "Put him in Grayson County and hold him

17   and don't give him any bond at all."

18         In terms of flight, no one should ever flee, but you are

19   talking about something that happened at the time in a matter --

20   a very short period of time, blocks, and somehow that's become a

21   flight risk not to appear in court.  If you look at the

22   pretrial, the court date he missed was for speeding 22 miles

23   over.  And, of course, it was a recall.  It was recalled.  It

24   was probably not even a bench warrant, probably a DOT referral.

25         In terms of flight risk, Judge, we have got all these people

1    here, numerous people, his mother, father, sisters, brothers,

2    they are all here.  There's no flight risk at all.  They would

3    make sure he's here.  And he would be here, including numerous

4    members of his family.

5        I could see if this was trafficking or anything like that,

6    but this is a nonpresumption.  They are just saying essentially,

7    "Well, you know, he's got a gun charge and we think he's not a

8    good guy, so lock him up."

9        If he was released, Judge, we would ask he be released on

10   home detention.  I can proffer to the Court that the reason they

11   used the word "utilized" is that his primary address and where

12   we would ask to live is with his mom and dad at 1659 Prentice

13   Avenue.  That's Shirley Summers and Chizvest Summers.  We would

14   ask that he live there.  Ms. Summers, the mother, works, but

15   the dad has disability and does not work and is home during

16   the day.  The mother has -- Shirley Summers has no record at

17   all.  We would ask that he live there on home detention, and we

18   would not ask for any releases whatsoever.

19       They have taken -- Judge, if you look here at the so-called

20   flight risk, they have got -- he didn't show up on a traffic

21   offense, and he ran a few blocks.  Somehow he's a flight risk.

22       When they talk about, Judge, danger to the community, one,

23   he's presumed innocent.  You could just throw away the key on

24   everybody and just say, "Well, they are guilty."  Two, it's a

25   serious case, yes, but there's nothing they have demonstrated

1    under the facts that he cannot be properly supervised in the

2    community, without a release, at his parents' home, never

3    getting out except to go to court.

4        So, you know, they have gone from four guns to two guns.

5    They really don't say that he, quote, lived at the place where

6    the gun was.  We will have him somewhere else, and we will have

7    people watch him 24 hours, and we could have GPS monitoring.

8        Judge, I don't think on this possession of a handgun case

9    that he should be detained, and I would ask the Court not to

10   detain him.

11            THE COURT:  All right.

12            MR. EGGERT:  Judge, if I could add one thing.

13            THE COURT:  Sure.

14            MR. EGGERT:  You noticed in that report it talked

15   about this pending burglary.  Well, I'm not a betting man, but

16   I'll bet a lot -- I'll bet a lot that he's never convicted of

17   burglary on Martez Banks.  But the real point I want to make is

18   when it says that that's pending, that's all part of this case.

19   It was listed as pending, which I understand technically it is,

20   but it's all part of this case.  He doesn't have an unrelated

21   burglary pending.

22            THE COURT:  All right.  Did Pretrial Services -- am I

23   recalling correctly when we went over the report that the

24   defendant's mother is a convicted felon?  Is that correct?

25            PROBATION OFFICER:  Yes, sir, from the nineties.

1          THE COURT:  Okay.  And the convictions were for?

2          PROBATION OFFICER:  For welfare fraud, and there was a

3    drug case.

4          MR. EGGERT:  Do we know when in the nineties?  20

5    years ago?  I was unaware of that.

6          PROBATION OFFICER:  I don't have the exact case

7    numbers.  I do remember it was 95-CR and 98-CR.

8          THE COURT:  Well, the Court is required to consider

9    the factors set forth in 18 U.S.C. 3142 in determining whether

10   there are conditions or a set of conditions the Court could

11   set that would reasonably assure that the defendant would appear

12   as directed and would not be a danger to the community or

13   another.

14       Let's go through the factors.  The first one is the nature

15   and circumstances of the offense charged.  The consideration is

16   whether or not it involved a firearm.  Well, it does.  So that

17   factor goes against Mr. Summers.

18       The second factor is the weight of the evidence against him.

19   It's not the evidence in terms of proof of guilt, but it's the

20   evidence in terms of risk of flight or danger to the community.

21   I'll come back to that one.

22       The next is the history and characteristics of the person,

23   including family ties, which apparently he has; employment,

24   which he does not.  Financial resources, there's no indication

25   of that.  Criminal history, that goes against him in terms of

```
1    his conviction in 2013 for felony trafficking and tampering with
2    physical evidence.
3        Let's see.  The next factor, or part of the same factor,
4    rather, at the time of the current offense or arrest was he on
5    probation, parole, or other release pending trial, sentencing,
6    appeal, or completion of the sentence.  Well, he was.  In fact,
7    he may not have been on active supervision.  It says that on
8    February 25th, 2016, he was placed on inactive supervision from
9    a sentence that was probated for five years back in 2014.  So
10   that weighs against him.
11       The next factor, the nature and seriousness of the danger
12   that would be posed by his release.  I think that ties back with
13   the fact of the weight of the evidence against a person.  While
14   the charge might be a felon in possession, the facts that we
15   have heard today make it -- in terms of the assessment for bond,
16   make it more difficult for Mr. Summers, that being he fled, not
17   only in the vehicle, but on foot.
18       He was on inactive supervision at the time.  He forcefully
19   entered a dwelling.  Now, whether he knew this person or not,
20   I'm still not clear on that.  He had a firearm.  Again, the
21   fleeing.
22       So the Government's burden as far as risk of flight is by a
23   preponderance of the evidence, and danger is by clearing and
24   convincing evidence.
25       I'm going to detain Mr. Summers and find that he is a danger
```

1    to the community and a risk of flight, and there are no

2    conditions or set of conditions I could impose that would

3    reasonably abate either.  So I'm going to remand him to the

4    custody of the Marshal's Service and order his detention pending

5    further order of the Court.

6        Anything else?

7            MS. MCKENZIE:  Not from the United States, Your Honor.

8            MR. EGGERT:  Please note my objection, Judge.

9    Honestly, we would have about a $2,500 bond in state court.

10           THE COURT:  All right.

11           MR. EGGERT:  Thank you.

12       (Proceedings concluded at 5:23 p.m.)

13

14                    C E R T I F I C A T E

15       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM
     THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

16
      _s/ Alan W. Wernecke_                    June 15, 2017
17    Alan W. Wernecke, RMR, CRR
      Official Court Reporter

18

19

20

21

22

23

24

25

```
1                            INDEX

2     WITNESSES:

3     JOSEPH HICKS
          Direct Examination By Ms. McKenzie           2
4         Cross-Examination by Mr. Eggert              8
          Redirect Examination  By Ms. McKenzie       27
5         Recross-Examination  By Mr. Eggert          32

6

7

8

9                          EXHIBITS

10
      Government Exhibit 1 -- map                       5
11    Government Exhibits 2-3 -- photographs            5

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```