UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
CIVIL ACTION NO. 3:17-CR-68-TBR

UNITED STATES OF AMERICA,                                               PLAINTIFF

v.

CHICOBY SUMMERS,                                                        DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court upon Defendant Chicoby Summers' ("Summers") Motion to Suppress. [DN 42.] The United States has responded, [DN 48], and Summers has replied. [DN 49.] This matter is now ripe for adjudication. For the following reasons, Summers' Motion is **DENIED.**

**I. Background**

This case arises out of a series of events occurring in early 2017, wherein law enforcement officers executed two separate search warrants in pursuit of "[m]arijuana and any other controlled substances in violation of KRS 218A," as well as drug-related paraphernalia. [DN 48-2, at 10.] The first search warrant at issue was for 9200 Bunsen Park Drive, Building 1, Apartment 208 in Louisville, Kentucky. [*Id.* at 9.] This warrant was executed on February 6, 2017. [*Id.* at 11.] The second search warrant covered the same type of contraband, also including heroin, and was for 7924 Zelma Fields Avenue in Louisville, Kentucky. [*Id.* at 2.] This warrant was executed on April 12, 2017. [*Id.* at 7.] These two searches, along with a separate incident in which Summers fled from police in his vehicle, allegedly produced, among other illicit items, three firearms. These three firearms provide the basis for the United States' indictment of Summers for being a person convicted of a felony, in possession of a firearm.

1

In the indictment, the United States notes that Summers was convicted of Trafficking in a Controlled Substance First Degree and Tampering with Physical Evidence in Jefferson County, Kentucky Circuit Court in 2014. [DN 8, at 1.] The indictment goes on to allege that Summers illegally possessed three firearms: "a Taurus 9-millimeter handgun bearing serial number TJY69069, and ammunition," a second Taurus 9-millimeter handgun bearing serial number TJW83525," and a Zastava 7.62-caliber pistol, Model PAP M92PV, with serial number M92PV053161. [*Id.* at 1-2.] Summers challenges the constitutionality of the above-mentioned searches, arguing that "[t]he four corners of the affidavits offered in support of those warrants failed to establish probable cause in support of the warrants," and thus, any fruits derived from the searches must be suppressed. [DN 42, at 1.]

## II. Legal Standard

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. In furtherance of protecting that interest, the Fourth Amendment demands that search warrants only issue upon a showing of probable cause. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause justifying the issuance of such a search warrant exists where, taking the totality of the circumstances, the affidavit supporting the warrant provides the issuant Magistrate with a "substantial basis…to believe 'there is a fair probability that contraband or evidence of illegal activity will be found in a particular place.'" *United States v. McNally*, 327 F. App'x 554, 556 (6th Cir. 2009) (quoting *Gates*, 462 U.S. at 238). Further, in order "[t]o justify a search, the circumstances must indicate why evidence of illegal activity will be found in a particular place." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). This requires "a nexus between the place to be searched and the evidence sought." *Id.* Therefore, the underlying affidavit which supports the

search warrant must actually "contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant." *United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999) (citing *Whiteley v. Warden*, 401 U.S. 560, 564 (1971)). Also, "[t]he supporting facts in an affidavit need not be based on direct knowledge and observations of the affiant, but may come from hearsay information supplied by an informant. *Id.* (citing *Jones v. United States*, 362 U.S. 257, 269-70 (1960)). The decision of Magistrate who initially issued the warrant will be reversed by this Court only if her "determinations were arbitrarily exercised." *United States v. Archibald*, 685 F.3d 553, 557 (6th Cir. 2012).

This Circuit has further interpreted *Gates*, instructing that a court, in reviewing the sufficiency of the evidence supporting probable cause, is "limited to examining the information contained within the four corners of the affidavit" in light of the totality of the circumstances. *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009). In order to deter future violations of the Fourth Amendment, the typical remedy for searches made with a defective warrant is suppression. *See United States v. Woodbury*, 511 F.3d 93, 99 (1st Cir. 2007). Notably though, suppression is not always warranted and, depending upon the circumstances, evidence may be saved from suppression where an officer acts in objectively good faith in executing an otherwise defective warrant. *United States v. Leon*, 468 U.S. 897, 922 (1984). This means that, in situations where "evidence [is] obtained in objectively reasonable reliance on a subsequently invalidated search warrant," the "marginal or nonexistent benefits [of suppression]…cannot justify the substantial costs of exclusion." *Id.* In such a case, although probable cause is lacking, the fruits of the search need not be suppressed.

**III. Discussion**

**A. February Warrant**

**1. Probable Cause Determination**

Summers' principal point in support of his argument that probable cause does not exist on the face of the February warrant is that "[t]he affidavit completely failed to establish any connection between controlled substances and Apt. 208 [the residence searched,]" or any connection to illegal activity more generally. [DN 42, at 1.] After careful review of the averments made in the affidavit to the February warrant, the Court disagrees. The affidavit explains that Summers was involved in a shooting in Louisville, Kentucky in November 2016, as were two other individuals, William Ron Stephenson Jr. and Keaun Mitchell. [DN 48-2, at 11.] On February 6, 2017, "Detectives observed…Stephenson, Michael Thompson, Stephonya Franklin, and Keaun Mitchell exit apartment 208…." [*Id.*] Detectives followed the car which these four individuals got into, and eventually pulled it over. "Upon Detectives removing listed subjects from aforementioned vehicle, Detective observed in plain view a Glock handgun in the center console area and an additional revolver in the back seat. Upon search incident to arrest, Detectives located several individually [wrapped] packs of marijuana (which is consistent with narcotic trafficking) on Keaun Mitchell's person." [*Id.*]

Moreover, Franklin indicated to police "that she ha[d] seen multiple guns in apartment 208 and said that there [was] a drum magazine on the night stand in the bedroom." [*Id.*] Finally, the "[p]roperty manager stated that there [were] unknown people that [were] not on the lease that [were] coming and going from the location at all times." [*Id.*] Thus, Summers' argument that the search of apartment 208 "for narcotics was based **solely** on the fact that Mitchell was seen exiting the apartment and Mitchell was found to have marijuana in his possession" does not give

4

full weight to the averments made in the affidavit. Specifically, while Summers characterizes the marijuana found on Mitchell's person generally as "in his possession," or "Mitchell's private possession of contraband," the Detectives who made the stop and found the marijuana made a point of noting that the marijuana was wrapped in individual packages, indicating that the drugs were meant for sale rather than personal use, something which was included in the affidavit. This, coupled with the guns that were recovered and the fact that the property manager told police that people were coming and going from the apartment at all hours, indicates the possibility of a trafficking operation in apartment 208.

To be sure, Summers correctly points out that, "[t]o justify a search, the circumstances must indicate why evidence of illegal activity will be found in a particular place. There must, in other words, be a nexus between the place to be searched and the evidence sought." *Carpenter*, 360 F.3d at 594 (internal quotation marks omitted). It is this "nexus" that Summers argues is lacking with respect to the affidavit to the February warrant and, consequently, why its fruits must be suppressed. In *Carpenter*, the Sixth Circuit held that an officer's affidavit was insufficient to establish probable cause to search a home located roughly 900 feet from an illegal marijuana growing operation. *Id.* at 593. In so holding, the Sixth Circuit made a note that the affidavit merely acknowledged the location of the marijuana plants and their proximity to the house in question. Importantly, the Sixth Circuit went on to provide that "[i]f [the] affidavit had stated that beaten paths led from the marijuana patches to the door of the residence, and that [people] had been spotted walking from the marijuana patches to the residence, the affidavit would likely have been sufficient to establish probable cause." *Id.* at 594.

Here, while the individual found to have marijuana packaged for trafficking was not Summers, it was one of his known associates, Keaun Mitchell, a person who was involved in the

5

same shooting as Summers in November 2016. Also, the Detectives personally observed Mitchell leaving apartment 208 immediately before finding the two firearms in the car and the marijuana on his person. This, as well as the property manager's statement that he observed individuals coming and going from the apartment at all hours, would trigger an officer's "experience and common sense" in concluding that there was a fair probability that drug trafficking or, at the very least, drug use, was occurring inside apartment 208. *See id.*

Explained another way, if the car in which these individuals were traveling simply happened to be stopped at a location *near* apartment 208, and the police did not indicate in the affidavit that they had personally observed these individuals leaving that apartment only moments before, Summers' argument would be much stronger. This is because a strong nexus would likely be lacking. In *Carpenter*, the Sixth Circuit made just that determination, noting that the police officer's "affidavit did not provide a substantial basis for the issuing judge's conclusion that probable cause existed to search the…residence, because it failed to set forth sufficient facts that incriminating evidence would be found *there*, rather than in some other place." *Carpenter*, 360 F.3d at 594. Indeed, "[t]he fact[] that marijuana was growing 'near' the residence and that a road ran nearby fall short of establishing the required nexus…." *Id.*

Thus, if the affidavit in this case merely stated that marijuana and guns were found on individuals in a car traveling on a street *near* apartment 208, probable cause to issue a search warrant for the residence would clearly be lacking. However, the affidavit was not so bare. All of the information explained above was included in the affidavit attached to the February warrant. That is, the Magistrate was apprised of the fact that numerous individuals possessing guns and an amount of marijuana indicative of trafficking were seen leaving the place to be searched, and the statement of one of these individuals placed more guns back at the apartment they had just left.

Moreover, the affidavit actually states that the landlord saw individuals coming and going at all times, another brick in the wall towards establishing probable cause. The issuing magistrate did not exercise his authority "arbitrarily," *see Archibald*, 685 F.3d at 557, and this Court finds that probable cause existed for the issuance of the February warrant.

### 2. Good Faith Exception

Moreover, even if probable cause was lacking, this Court finds that the good faith exception to the warrant requirement would apply, and the evidence would not be suppressed anyways. "When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). However, Courts should refrain from suppressing "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *Leon*, 468 U.S. at 922. Importantly, though, "this good-faith exception to the exclusionary rule does not apply in circumstances where 'the officer will have no reasonable grounds for believing that the warrant was properly issued.'" *Carpenter*, 360 F.3d at 595 (citing *Leon*, 468 U.S. at 923). "Thus, an officer would not 'manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* (citing *Leon*, 468 U.S. at 923). Crucially, the good-faith exception requires a "less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause." *Id.*

The Sixth Circuit has found that, where "the affidavit contain[s] a minimally sufficient nexus between the illegal activity and the place to be searched," this is sufficient "to support an officer's good-faith belief in the warrant's validity, even if the information provided was not enough to establish probable cause." *Id.* at 596. There is certainly a "minimally sufficient nexus"

between the illegal activity and the place to be searched in this case. Indeed, officers personally observed, and later described in writing in the affidavit, that the individuals found to have guns and drugs, apparently packaged for trafficking, were found with this contraband immediately after leaving the place to be searched, apartment 208. Moreover, one of these individuals verbally linked apartment 208 to potentially illegal activity when she instructed officers that she had personally observed guns inside the residence. Lastly, the landlord provided an additional connection between the residence and the illegal activity, telling officers that individuals came and went at all hours from apartment 208, an activity that could lead an officer to conclude that illegal activities were occurring within.

In sum, the Court finds that the warrant is valid on its face, and the affidavit in support of it provides sufficient facts to establish probable cause for the warrant's issuance. The Magistrate made a "practical, common-sense judgment call[]" required for "a probable cause determination." *Gates*, 462 U.S. at 244. Moreover, even if the facts laid out in the affidavit, taken together, were insufficient to rise to the level of probable cause, the good-faith exception would apply here. This is because there was a minimally sufficient nexus between the illegal activity and the place to be searched, such that an officer would have had reasonable grounds to rely on the warrant and the affidavit in conducting the search of apartment 208. Summers' motion is denied as to the February warrant.

### B. April Warrant

#### 1. Probable Cause Determination

Summers also argues that probable cause was lacking for the issuance of the April 12 warrant for the search of 7924 Zelma Fields Avenue. As the Supreme Court has noted, "[t]he critical element in a reasonable search is not that the owner of the property is suspected of a

crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). As applied to this case, the question is not whether Summers was suspected of a crime, but whether the affidavit set forth sufficient facts that evidence of a crime or crimes would be found at the Zelma Fields residence. Thus, an examination of those averments is necessary.

In the April warrant affidavit, the affiant officer first avers that the February 6 search of apartment 208 resulted in police uncovering "an AK 47 rifle, heroin, marijuana, drug paraphernalia, and a large amount of U.S. currency." [DN 48-2, at 4.] Next, the affiant provides that police had witnessed Summers "come and go from 7924 Zelma Fields Avenue on numerous occasions throughout the months of February and March…and has been seen using a key to unlock the apartment front door." [*Id.*] The affiant then describes the events that unfolded on the morning of April 12, 2017: Summers was at the Zelma Fields residence before departing for 1711 Wilson Avenue, "a known associate's house…." [*Id.*] Summers later left that residence with two other men, at which time officers attempted a traffic stop. [*Id.*] They fled in the car, and later on foot, before entering the residence at 1728 Youngland Avenue. [*Id.*] Officers entered the residence, at which time Summers came down the stairs from the second floor bedroom. [*Id.*] "Search incident to arrest, detectives found two Watson (hydrocodone) white pills in [Summers'] front right coin pocket and a holster that he had in his front waist band. Detective Chuck Popham then found [a] small bag of crack cocaine that had been packaged for sale in the area [where Summers] was standing…." [*Id.*] While searching the Youngland residence, detectives found a Taurus 9mm, which fit in Summers' holster, in the second floor bedroom that Summers had exited when detectives initially entered the Youngland residence. [*Id.*] A witness who saw the car chase relayed to police that they had seen a gun thrown from the car, an AK 47 which "was

identical to the…AK 47 that was recovered from a search warrant" for apartment 208 in February. [*Id.*] The affidavit concludes by noting that Summers has a prior conviction for trafficking in a controlled substance (cocaine) first degree, and that the owners of the Youngland residence told police that Summers had no right to be in their home when he was found. [*Id.*]

The great detail the affidavit goes into fails to discuss in any real depth the house on Zelma Fields Avenue, or to provide facts explaining exactly why the house was ripe to be searched. To be sure, the affidavit provides a lengthy account of alleged criminal activity on the part of Summers, and discusses the search of apartment 208 and the fruits it bore, as well as the fact that Summers has been convicted of trafficking in cocaine. Even so, noticeably absent from the affidavit are articulable facts creating a strong connection regarding why there was probable cause to believe drugs or other evidence of crimes would be found inside the Zelma Fields residence.

This leads the Court back to the "nexus" requirement, explained above. It bears repeating, though, that "the affidavit supporting the search warrant must demonstrate a nexus between the evidence sought and the place to be searched." *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (citing *Carpenter*, 360 F.3d at 594). Importantly, "[t]he connection between the residence and the evidence of criminal activity must be specific and concrete, not 'vague' or 'generalized.'" *Id.* (citing *Carpenter*, 360 F.3d at 595). This means that "[i]f the affidavit does not present sufficient facts demonstrating why the police officer expects to find evidence in the residence rather than in some other place, a judge may not find probable cause to issue a search warrant." *Id.* In *Brown*, the Sixth Circuit noted that "the search warrant affidavit contained no evidence that Brown distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there." *Id.* Moreover, it "did not suggest that a reliable

informant had purchased drugs there, that the police had ever conducted surveillance [there]" and seen such evidence, "or that the recorded telephone conversations linked drug trafficking to Brown's residence." *Id.* In short, a nexus was lacking.

The Court finds the case here to be analogous with respect to the April warrant. The only mention of the Zelma Fields residence, the actual place to be searched by order of the warrant, was that Summers had a key to the residence and used it sometimes, and that he was present at the residence on the morning of April 12. Conversely, the affidavit does *not* aver that drug transactions had occurred there, that Summers was known to sell or store drugs at the residence, or that any police surveillance had indicated that such activity was taking place there. In short, no strong nexus has been established. The damning information regarding Summers' alleged criminal activity relates to a search warrant executed at a different residence, apartment 208, as well as the police chase later in the day on April 12. Crucially though, Summers did not flee from the Zelma Fields house, nor did he take any observed illegal actions there. Instead, he went to a second residence, whereupon he went inside and exited again with two other individuals. It was only then that police gave chase and weapons and drugs were discovered.

Lastly, it is true that, "[i]n the case of drug dealers, evidence is likely to be found where the dealers live," *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998), and so this circuit has sometimes "permitted judges to infer a fair probability of finding evidence in a residence even though the affidavit did not state that such evidence had been observed directly." *Brown*, 828 F.3d at 383. However, the Sixth Circuit has "never held…that a suspect's 'status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home.'" *Id.* (quoting *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005)). "Rather, we have required some reliable evidence connecting the known drug dealer's ongoing criminal activity to the

11

residence; that is, we have required facts showing that the residence had been used in drug trafficking…." *Id.* Thus, even given the averments laid out in the affidavit regarding the guns and drugs and their relationship to Summers, no strong connection was ever made between them and the Zelma Fields residence, and probable cause was therefore lacking.

### 2. Good Faith Exception

The final question presented to the Court is, given that probable cause was lacking for the April warrant, whether the good faith exception applies, and the fruits of the search need not be suppressed. The good faith exception's standard is laid out above.

"Applying a practical, common sense manner reading of the warrant," the Court "is of the opinion that only a police officer with extraordinary legal training would have detected any deficiencies in that document." *See United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998). This is due to the lengthy descriptions of the criminal enterprises in which Summers was allegedly involved, including drug trafficking, coupled with the fact that he appeared to be using Zelma Fields as a residence. Officers had personally observed Summers at the Zelma Fields residence, and had participated in the chase that resulted in the seizure of both weapons and narcotics. In *Van Shutters*, the Sixth Circuit upheld the search under the good faith exception where the underlying affidavit "described the residence, the items sought, and the defendant's counterfeiting scheme, but connected the place to the illegal activity only by stating that the residence 'was available' to the defendant." *See Carpenter*, 360 F.3d at 596 approving of the holding in *Van Shutters*, 163 F.3d at 331. The Sixth Circuit's decision in *Van Shutters* bears a strong resemblance to the facts of this case. The April warrant affidavit describes the Zelma Fields residence, the items sought ("marijuana, heroin, and any other controlled substances…"), the multiple encounters Summers had had with law enforcement at that time, and further

12

explained that Summers held a key for, and had access to, the apartment and frequented it. This is sufficient for the Court to hold that the good faith exception applies and, although there was no probable cause for the issuance of the warrant, the fruits of the search of the Zelma Fields residence need not be suppressed.

## IV. Conclusion

For the reasons stated herein, **IT IS HEREBY ORDERED** that Summers' motion to suppress [DN 42] is **DENIED.**

**IT IS SO ORDERED.**

cc: Counsel of record